***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Homick and the briefs and arguments before the Full Commission. The appealing parties have not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties at the hearing and as part of the Pre-trial Agreement as: *Page 2 
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. All parties have been properly designated and there is no question as to misjoinder or nonjoinder or parties.
4. Defendant-employer and defendant-carrier stipulate that they are liable for plaintiff's entire period of employment with Domtar and Weyerhaeuser Paper Company, its predecessor in interest.
5. An employment relationship existed between the parties for all relevant time periods and Domtar Paper Company is the employer and Johnnie Mack Ruffin is the employee. The plant in Plymouth, North Carolina where plaintiff works was previously owned by Weyerhaeuser Paper Company but was bought by defendant-employer Domtar in April of 2006. Domtar stipulates that it acquired the liabilities of its predecessor Weyerhaeuser for all employees still employed when it bought the plant.
6. At all times relevant to this action, Liberty Mutual was the workers' compensation insurance carrier on the risk.
7. Plaintiff is a current employee of Domtar and began working at the plant in Plymouth for Weyerhaeuser on August 3, 1973.
8. The parties stipulated to the admissibility of the following documents, which were received into evidence:
 • Exhibit 1: Pre-Trial Agreement; *Page 3 
 • Exhibit 2: Compilation of documents including Discovery Responses, Industrial Commission Forms and Filings, Audiometric File and Medical and Audiometric Testing Results (Pages 1-111);
 • Exhibit 3: Medical Reports by Dr. Gidley, Medical Reports from Carolina Audiology, Deposition Transcript of Larry H. Royster, Ph.D and Article by Julia D. Royster, Ph.D and Larry H. Royster, Ph.D. (Pages 1-295); and
 • Exhibit 4: Noise Level Surveys, submitted post-hearing (pages 1-284).
9. Plaintiff introduced into evidence a compilation of hearing test calculations, which has been marked as Plaintiff's Exhibit 1 and received into evidence.
10. The issues before the Full Commission are whether plaintiff contracted an occupational hearing loss as a result of his employment with Domtar and/or Weyerhaeuser and if so, whether plaintiff is entitled to receive any benefits as a result of the alleged occupational hearing loss.
 ***********
Based upon all of the competent evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 54 years old. Plaintiff has worked for defendant-employer for approximately 36 years, since August 3, 1973, in various departments at its facility in Plymouth, North Carolina. Plaintiff is currently a senior mechanic, a job he has held since 1986. Plaintiff testified that as a mechanic, he worked throughout the plant. *Page 4 
2. According to defendant-employer's noise surveys dating to the early 1970s when plaintiff commenced work, many of the areas in which plaintiff worked had sustained noise levels exceeding 90 decibels, which are considered to be harmful levels. Plaintiff's exposure to loud noise levels varied depending on
the job he was performing, the area in which he was performing it, and the type of equipment being operated in the area.
3. While in the timberlands department, plaintiff was exposed to high levels of noise from bulldozers and other logging equipment, which were often in excess of 90 decibels. Plaintiff testified that he spent eight hours each workday on a loud bulldozer with an 800-horsepower diesel motor. No muffler was installed and hearing protection was not used to reduce the noise level. Noise surveys from 1985 indicate that the noise levels produced from the operational bulldozers could be as high as 93 decibels.
4. Plaintiff also worked as a millwright in the maintenance department, a position he held for approximately two years. As a millwright, plaintiff was exposed to noise levels above 90 decibels while working in various areas of the facility including near wood chippers, refiners, paper machines and in the boiler rooms.
5. As a mechanic, plaintiff worked primarily around the plant's paper machines, where noise levels also exceeded 90 decibels in certain areas. A 1981 noise survey near the Number 2 paper machine indicated noise levels ranged from 91 decibels to 98 decibels. Noise levels around the chipper, where plaintiff had worked, ranged from approximately 92 to 111 decibels. The area around the refiners, where plaintiff testified that he also had worked, measured as high as 94 decibels. In the pump house, measurements taken in 1987 indicated noise levels ranged from 94 to 109 decibels. A 1987 internal report submitted into evidence noted that maintenance employees were observed in the building without personal ear protection. *Page 5 
Plaintiff testified that overall, as a mechanic, he works in very noisy areas, where it is often impossible to hear someone speaking due to the noise of the machines.
6. In addition to the constant noise from the machinery, plaintiff testified that there are valves throughout the facility that serve to relieve steam pressure, which builds up in the pipes. The release of the steam pressure makes a very loud shrill sound. These valves would "pop-off" approximately ten times per month. As plaintiff testified, the sound from the valves was so loud that it could be heard several miles away. Plaintiff testified that on one occasion, he was within six feet of the valve when it released steam. For many years, plaintiff's hearing was unprotected from these loud sounds within the facility.
7. With respect to the availability of hearing protection devices, when plaintiff started working at the plant, hearing protection was not required but was available at the first aid office. Although there was some inconsistency in the evidence as to exactly when plaintiff began wearing hearing protection on a regular basis, plaintiff testified that in the mid to late 1980's, the wearing of hearing protection became mandatory and hearing protection was then available in the specific work areas. Plaintiff's testimony was corroborated by other witnesses who also had worked for defendant-employer.
8. Plaintiff also testified that he was never instructed on the proper use of ear protection. Plaintiff generally wore ear plugs but certain areas required the wearing of double protection of plugs and ear muffs. Plaintiff testified that he had never been reprimanded for not wearing hearing protection. Dr. Mary Katherine Keeter, an audiologist, testified that hearing protection does not necessarily prevent hearing loss due to noise exposure but may reduce the likelihood, assuming the employee understands the correct use of the hearing protection. *Page 6 
9. The Full Commission finds that the actual effectiveness of individual protective hearing devices that plaintiff may have subsequently worn cannot be definitively determined as there are many factors that may affect the degree of protection. Dr. Lewis Gidley, an audiologist, testified that often ear protection is not worn as the manufacturer specifies and is often soiled, which reduces its effectiveness. Dr. Gidley further opined that the degree of protection also depends on the type of noise, whether it is impact or long term, the frequency of the noise, which ear happens to be turned toward the noise, and how reverberant the room is.
10. On September 8, 2009, Dr. Robert Quinn, an ear, nose and throat specialist who has been board certified in the field since 1985 and who has extensive experience in hearing loss, reviewed plaintiff's records and history, including plaintiff's audiograms and examination reports. Dr. Quinn testified that he was able to review plaintiff's hearing test results and identify a pattern of noise-induced hearing loss. Dr. Quinn opined that based upon the results of the hearing tests, "there is a definitive indication of a sensorineural noise induced hearing loss bilaterally resulting from years of chronic exposure to noise at work." The Full Commission gives great weight to the opinions of Dr. Quinn, who is an ear, nose and throat specialist with extensive experience with hearing loss.
11. On July 15, 2009, Dr. Gidley, who has a clinical doctorate in audiology, examined plaintiff on three occasions at the request of Weyerhaeuser and its successor-in-interest, defendant-employer. Dr. Gidley opined that plaintiff had noise-induced hearing loss in both ears of high frequency since the test results consistently improve at 8000 hertz versus 4000 or 3000. However, Dr. Gidley was unable to specifically identify the noise which caused the loss.
12. Dr. Keeter, an audiologist, performed an otoscopic exam on plaintiff and conducted speech reception threshold, speech discrimination and air and bone conduction *Page 7 
testing. Dr. Keeter opined that plaintiff had a sensory neural hearing loss, that plaintiff's greatest hearing loss was from 1974 to 1987, and that the hearing loss was likely noise-related. Although Dr. Keeter was unable to opine to what extent plaintiff's work contributed to his hearing loss, she did opine that it was likely his work was the cause. Dr. Keeter did not think plaintiff's hearing loss was due to age since he was fairly young when the majority of his loss occurred.
13. Dr. Robert Dobie, an otolaryngologist, reviewed plaintiff's medical records, audiograms and noise level testing results from the facility but never examined plaintiff. Dr. Dobie opined that plaintiff's hearing loss was due to plaintiff's age and his recreational hunting. Dr. Dobie opined that it was unlikely that plaintiff's loss was the result of workplace exposure with defendant-employer and that plaintiff's use of the hearing protection at the facility was sufficient to protect him from noise above the levels indicated in the noise surveys. Dr. Dobie's opinions directly contradict the opinions of Dr. Keeter, who actually interviewed and examined plaintiff, as well as the opinions of Dr. Quinn. The Full Commission gives greater weight to the expert opinions of Drs. Quinn and Keeter than to those of Dr. Dobie.
14. Plaintiff is a recreational hunter and still uses firearms on an occasional basis but does wear hearing protection. Dr. Gidley noted that although plaintiff experienced greater loss in his left ear based on the audiogram configuration, Dr. Gidley could not specifically identify whether the greater loss was due to hunting or some other factor.
15. Similarly, Dr. Keeter was unable to assign the relative contribution to plaintiff's hearing loss from recreational and occupational exposures.
16. Dr. Quinn testified that the difference in hearing loss in plaintiff's ears may be due to how a person physically positions himself in the workplace, physiological weaknesses due *Page 8 
to childhood illnesses, or even additional wax build-up in one ear which would tend to provide additional protection from loud noise.
17. There is insufficient evidence of record upon which to determine the degree, if any, of plaintiff's hearing loss that may be attributable to his recreational hunting activities.
18. The Full Commission finds that during plaintiff's 36 years of employment with Weyerhaeuser and its successor-in-interest, defendant-employer, plaintiff sustained permanent sensorineural loss of hearing in both ears caused by prolonged exposure to harmful noise in the workplace.
19. During the period of plaintiff's employment with defendant-employer, plaintiff received regular audiogram tests. Although a pre-employment audiogram was not in evidence, on March 9, 1974, plaintiff underwent an audiogram at Weyerhaeuser, which is the earliest audiogram in the record of evidence and the closest to the date plaintiff commenced work for defendant-employer on August 3, 1973. This audiogram revealed hearing levels of 5, 15, 25 and 10 in the left ear and 5, 10, 10, and 0 in the right ear, at the relevant 500, 1000, 2000 and 3000 frequencies. Further, pursuant to N.C. Gen. Stat. § 97-53(28)(g), if the losses of hearing average 15 decibels or less in the four frequencies, such loss of hearing shall not constitute any compensable hearing disability. Plaintiff's levels were below 15 decibels in both ears as noted below. Accordingly, there was no evidence that plaintiff sustained any non-occupational hearing loss prior to his employment with Weyerhaeuser or its successor-in-interest, defendant-employer.
1974 audiogram: Left Ear: 5 + 15 + 25 + 10 = 55 ÷ 4=13.75
 Right Ear: 5 + 10 + 10 + 0 = 25 ÷ 4 = 6.25

20. Plaintiff's last audiogram was performed by Dr. Gidley on July 15, 2009, when defendant-employer referred plaintiff for an audiological evaluation. This audiogram revealed *Page 9 
hearing levels of 30, 35, 80 and 75 in the left ear and 30, 30, 60 and 70 in the right ear, at the relevant 500, 1000, 2000 and 3000 frequencies.
21. The method for calculating the level of hearing loss is set forth in N.C. Gen. Stat. § 97-53(28)(g) and states "[t]he percentage of hearing loss shall be calculated as the average, in the decibels, of the thresholds of hearing for frequencies of 500, 1000, 2000 and 3000 cycles per second."
2009 audiogram: Left Ear: 30 + 35 + 80 + 75 = 220 ÷ 4 = 55
 Right Ear: 30 + 30 + 60 + 70 = 190 ÷ 4 = 47.5

21. Once the average is obtained, 26 is subtracted from the average to obtain the net decibel loss. The net decibel loss is then multiplied by 1.5, which yields the percent of loss to that ear.
Left Ear: 55 — 26 = 29 x 1.5 = 43.50%
Right Ear: 47.5 — 26 = 21.5 x 1.5 = 32.25%

22. To determine the binaural percentage loss, the percentage of impairment in the better ear is multiplied by five.
2009 levels for right ear (better ear): 32.25 x 5 = 161.25

The resulting figure is added to the percentage of impairment in the poorer ear, and the sum is divided by six, as set forth below. The final percentage represents the binaural hearing impairment. From 2009, the figure of 161.25 is added to the percentage of impairment for plaintiff's poorer ear of 43.50 to equal 204.75 which, when divided by 6, results in a current binaural hearing impairment level of 34.125. The statutory threshold level is 26; therefore, plaintiff would be entitled to compensation for hearing loss. The binaural hearing loss is multiplied by 150% (1.5), which yields the number of weeks compensation would be payable.
2009 impairment level: 161.25 + 43.50 = 204.75 ÷ 6 =34.125 x 1.5 = 51.19
 *Page 10 
24. At the hearing, the parties stipulated that plaintiff would qualify for the maximum compensation rate. The maximum compensation rate for 2009 is $816.00.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. In order to obtain an award of workers' compensation for loss of hearing under N.C. Gen. Stat. § 97-53(28), a plaintiff must prove that he suffered a loss of hearing in both ears which was caused by harmful noise in his work environment. Price v. BroyhillFurniture, 90 N.C. App. 224, 368 S.E.2d 1 (1988).
2. North Carolina industrial noise monitoring procedures require noise to be measured in the workplace. Contentions that compliance with the 90 decibel standard should be measured inside the hearing protective device worn by the employee, rather than in the workplace itself, have been rejected. Clark v. Burlington Industries,Inc., 78 N.C. App. 695, 338S.E.2d 553, cert. denied,316 N.C. 375, 342 S.E.2d 892 (1986).
3. Plaintiff sustained a compensable occupational disease that arose out of and in the course of his employment with defendant-employer resulting in a permanent binaural sensorineural hearing loss due to prolonged exposure to harmful noise in the workplace. N.C. Gen. Stat. § 97-53(28).
4. Regular use of protective devices constitutes removal from exposure only for purposes of triggering the statutory six-month waiting period established by N.C. Gen. Stat. § 97-53(28)(i). Otherwise, the employee would be faced with the choice of waiting until he had left the employment or leaving the employment solely to enable him to file a claim. This provision *Page 11 
allows an employee to file a claim while continuing in the employment. Clark v. Burlington Industries, Inc.,78 N.C. App. 695, 338S.E.2d 553, cert. denied,316 N.C. 375, 342 S.E.2d 892 (1986).
5. As a result of plaintiff's prolonged exposure to harmful noise in the workplace, constituting an occupational disease, plaintiff sustained a binaural hearing impairment level of 34.125. Plaintiff is therefore entitled to receive compensation at the rate of $816.00 per week for 51.19 weeks. N.C. Gen. Stat. § 97-52 (28).
6. As a result of plaintiff's prolonged exposure to harmful noise in the workplace, constituting an occupational disease, plaintiff is entitled to payment by defendants of all medical expenses incurred or to be incurred as a result of his compensable occupational hearing loss, including the provision of any hearing aid devices which may be prescribed, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-2(19), 97-25, 97-59.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee approved below, defendants shall pay plaintiff compensation at the rate of $816.00 per week for a total of 51.19 weeks, totaling $41,771.04. As this compensation has accrued, it shall be paid in a lump sum.
2. Defendants shall pay all past and future medical expenses incurred or to be incurred as a result of plaintiff's compensable occupational hearing loss, including the provision of any hearing aid devices which may be prescribed, for so long as such examinations, *Page 12 
evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability.
3. A reasonable attorney's fee in the amount of 25% of the compensation due plaintiff under Paragraph One of this Award is approved for plaintiff's counsel and shall be paid directly to plaintiff's counsel.
4. Defendants shall pay the costs.
This 18th day of October, 2010.
 S/_______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ LINDA CHEATHAM COMMISSIONER
 S/_____________ STACI T. MEYER COMMISSIONER *Page 1